**PACIFIC POWER & LIGHT COMPANY, Plaintiff,**

**v.**

**Charles William DUNCAN, Jr., Secretary of the United States Department of Energy; Ruth M. Davis, Assistant Secretary of the United States Department of Energy for Resource Application; and Sterling Munro, Administrator of the Bonneville Power Administration, Defendants.**

**Portland General Electric Company, and Public Utility Commissioner of Oregon, Intervenors–Plaintiffs.**

**Public Power Council, Intervenor–Defendant.**

Civ. No. 80–82.

United States District Court, D. Oregon.

Oct. 21, 1980.

Hugh Smith, George M. Galloway, Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., for plaintiff.

Sidney I. Lezak, U. S. Atty., Thomas C. Lee, Asst. U. S. Atty., Portland, Or., for government defendants.

James W. Durham, Warren Hastings, Alvin Alexanderson, Portland, Or., for intervenor–plaintiff Portland Gen. Elec.

James M. Brown, Atty. Gen., Paul A. Graham, Asst. Atty. Gen., Dept. of Justice, Salem, Or., for intervenor–plaintiff State of Oregon.

Norman A. Stoll, Alan S. Larsen, Stoll & Stoll, P. C., Portland, Or., for intervenor–defendant.

## AMENDED OPINION

PANNER, Judge.

### OVERVIEW

Rate increases for electricity distributed by the Bonneville Power Administration (BPA) were proposed by its Administrator. An Assistant Secretary of the Department of Energy (DOE) approved the rates on an interim basis under authority delegated to her by the Secretary of Energy. Pursuant to the same delegation order, the Federal Energy Regulatory Commission (FERC) is now reviewing the proposed rate changes. Pacific Power & Light (PP&L) filed this suit against the Secretary, the Assistant Secretary, and the Administrator, challenging the interim rates. Portland General Electric (PGE) and the Public Utility Commissioner of the State of Oregon (PUC) intervened as plaintiffs, and the Public Power Council (PPC) intervened as a defendant.

Before trial, the government filed a motion to dismiss and a motion for summary judgment. I deferred ruling on the motions and conducted an abbreviated trial on stipulated facts. The parties have presented all relevant evidence. For the reasons outlined below, I reach the merits and grant judgment for the defendants.

The problem arises as a result of the transfer of authority over the BPA from the former Federal Power Commission (FPC) and Secretary of the Interior to the new DOE and FERC. The division of responsibility between the DOE and the FERC differs significantly from the division that existed between the FPC and the Secretary of the Interior. Under the new system, proposed rate increases by the BPA and similar entities are subject to interim approval by an Assistant Secretary of the DOE before full consideration by the FERC.

The central issue in this case is whether Congress, in enacting the DOE legislation, granted ratemaking authority for the BPA to the Secretary of Energy. I conclude that it did.

To the extent that plaintiffs base their challenges on contract, the remedy of specific performance is not available against the government. To the extent that the plaintiffs challenge the power of the Secretary of Energy to approve interim rates, I find that the Secretary has such power. To the extent that plaintiffs challenge the procedures employed in promulgating and approving the rates, I find that the defendants followed appropriate procedures. Finally, to the extent that the plaintiffs challenge the substance of the interim rates, I hold that judicial review is precluded because there is "no law to apply."

Accordingly, I grant judgment to the defendants.

### FACTS

I rely upon the following stipulated facts: numbers 1, 5, 19, 25, 26, 27, 28, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 44 and 45. Objections to the relevancy of any of these stipulated facts are overruled. *See generally, Port of Astoria, Oregon v. Hodel*, 595 F.2d 467, 471–73 (9th Cir. 1979); *Natural Resources Defense Council v. Hodel*, 435 F.Supp. 590, 591–95 (D.Or.1977) (outline the BPA's role in the Pacific Northwest).

### ISSUES

1. Are claims under a government contract cognizable in this forum?

2. Does the Secretary of Energy have the authority to approve interim rates of the BPA?

3. Have the plaintiffs been given all the process due them?

4. With respect to the substance of the interim rates, is there any law to apply?

### JURISDICTION

42 U.S.C. § 7192 provides in pertinent part:

(a) Judicial review of agency action taken under any law the functions of which are vested by law in, or transferred or delegated to the Secretary, the Commission or any officer, employee, or component of the Department shall, notwithstanding such vesting, transfer, or delegation, be made in the manner specified in or for such law.

(b) Notwithstanding the amount in controversy, the district courts of the United States shall have exclusive original jurisdiction of all other cases or controversies arising exclusively under this chapter, or under rules, regulations, or orders issued exclusively thereunder . . . .

42 U.S.C. § 7191 provides in pertinent part:

(a)(1) Subject to the other requirements of this subchapter, the provisions of subchapter II of chapter 5 of title 5 [5 U.S.C. §§ 551 et seq.] shall apply in accordance with its terms to any rule or regulation, or any order having the applicability and effect of a rule . . . .

5 U.S.C. § 702 provides for judicial review of agency action, limiting that review by stating:

Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 701 also provides in pertinent part that:

(a) This chapter applies, according to the provisions thereof, except to the extent that—

(1) statutes preclude judicial review; or

(2) agency action is committed to agency discretion by law.

As stated in *City of Santa Clara, California v. Andrus*, 572 F.2d 660, 669 n. 5 (9th Cir.), *cert. denied*, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978) (quoting *East Oakland–Fruitvale Planning Council v. Rumsfeld*, 471 F.2d 524, 533–34 (9th Cir. 1972)):

Agency action is made unreviewable by 5 U.S.C. § 701(a)(2) only "to the extent" that it is committed to agency discretion. . . . An "all or nothing" approach to reviewability would, in specific cases, either be unfair to persons aggrieved by agency action, or impose an unwise burden upon the agency or the courts. Accordingly, separable issues appropriate for judicial determination are to be reviewed, though other aspects of the agency action may be committed to the agency's expertise and discretion.

If a statute or regulation establishes a rule governing the conduct of the agency with respect to an aspect of the agency action, a court may determine whether the agency has complied with that rule, although the court still may not review other aspects of the agency action as to which there are no reasonably fixed rules to apply. The presence of a judicially enforceable rule both justifies judicial review, and limits its scope.

## SCOPE OF REVIEW

Because the plaintiffs challenge an agency's actions, I am limited to a very narrow scope of review. As a general rule:

The analysis of the proper scope of review begins with the Supreme Court's decision in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 [91 S.Ct. 814, 28 L.Ed.2d 136] . . . (1971). . . . The appropriate standard of review was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 413–14, [91 S.Ct. at 822.] . . . Under this standard, de novo review of the agency's action was not warranted. *Id.* at 415 [, 91 S.Ct. at 823.] . . . De novo review is authorized only where the action is adjudicatory and agency fact–finding procedures are inadequate, or where issues not before the agency are raised in a proceeding to enforce nonadjudicatory agency action.

Nevertheless, the Court held that the reviewing court is required to engage in a "substantial inquiry," i. e., "a thorough, probing, in–depth review." *Id.* Pursu-

ant to this inquiry, the reviewing court must first consider whether the Secretary acted within the scope of his authority. Next, to determine whether the decision was arbitrary or capricious, the court must consider whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Id.* Although this factual inquiry is to be "searching and careful" the ultimate standard of review is narrow. "The court is not empowered to substitute its judgment for that of the agency." *Id.* at 416 [91 S.Ct. at 823.] . . . Finally, the court must inquire whether the Secretary followed the necessary procedural requirements.

*Asarco, Inc. v. U.S.E.P.A.*, 616 F.2d 1153, 1158 (9th Cir. 1980). The scope of review is even more restricted when applied to energy regulatory agencies:

[T]he breadth and complexity of the Commission's [FPC] responsibilities demand that it be given every reasonable opportunity to formulate methods of regulation appropriate for the solution of its intensely practical difficulties. This Court has therefore repeatedly stated that the Commission's orders may not be overturned if they produce "no arbitrary result." . . .

. . . . .

. . . [T]he responsibilities of a reviewing court are essentially three. First, it must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to . . . provide appropriate protection to the relevant public interests. . . . The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its lik-

ing, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.

. . . . .

It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the [Natural Gas] Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that is invalid because it is unjust and unreasonable in its consequences.

*Nevada Power Co. v. Federal Power Commission*, 589 F.2d 1002, 1005–06 (9th Cir. 1979) (quoting *Permian Basin Area Rate Cases*, 390 U.S. 747, 790–92, 88 S.Ct. 1344, 1372–1373, 20 L.Ed.2d 312 (1968); *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944)).

## DISCUSSION

### I. *Contract Contentions*

Although plaintiffs discuss their various BPA contracts at length, they do not proceed under an express contract theory, and they do not pray explicitly for specific performance. However, plaintiffs do pray for general injunctive and declaratory relief. To the extent that their complaints can be construed as requests for specific performance, their requests must be denied. The government cannot be compelled to specifically perform its contracts because of its sovereign immunity. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). Although the government may waive its sovereign immunity from contract claims, it has not done so here. *See Lee v. Blumenthal*, 588 F.2d 1281 (9th Cir. 1979).

■ Of course, to the extent that plaintiffs allege "that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority," Congress waived sovereign immunity in amending 5 U.S.C. § 702, and plaintiffs may otherwise maintain this suit. *City of Santa Clara, California v. Andrus,* 572 F.2d 660, 679 (9th Cir.), *cert. denied,* 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978). *See Port of Astoria, Oregon,* 595 F.2d at 474, 479. *See also Papago Tribal Utility Authority v. FERC,* 610 F.2d 914 (D.C.Cir. 1980); *City of Oglesby v. FERC,* 610 F.2d 897 (D.C.Cir.1980) ("enforcing" contract provisions against FERC under Federal Power Act (FPA)).

## II. *Authority to Approve Interim Rates*

Plaintiffs challenge the Secretary of Energy's authority to approve BPA's proposed interim rates. Previously, authority to approve most rate schedules for the BPA was entrusted to the FPC. 16 U.S.C. §§ 825s, 832e, 838g. Authority to approve rate schedules for electricity marketed by the BPA under the Reclamation Act was entrusted to the Secretary of the Interior. 43 U.S.C. § 485h(c). In 1977, the FPC was abolished, and its functions, as well as those powers of the Secretary of the Interior relating to energy matters, were transferred to the Secretary of Energy and the FERC. 42 U.S.C. § 7101 *et seq.* As plaintiffs assert, FPC's authority under Part II of the Federal Power Act (FPA), which relates to ratemaking for electrical utilities, was transferred to the FERC, not the Secretary of Energy. 42 U.S.C. § 7172(a)(1) (B). However, 16 U.S.C. § 824(f) states that:

No provision in this subchapter [Part II of the FPA] shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty,

unless such provision makes specific reference thereto.

Plaintiffs have failed to point out any such specific reference to the BPA in either the FPA or the DOE statutes, and therefore Part II of the FPA does not apply to the BPA. Hence, by its own terms, 42 U.S.C. § 7172(a)(1)(B) does not vest the FERC with regulatory authority over the BPA rates challenged here. In the absence of a specific reference to the FERC, Congress granted such authority to the Secretary of Energy:

Except as provided in subchapter IV of this chapter [42 U.S.C. § 7171 *et seq.*], there are transferred to, and vested in, the Secretary [of Energy] the function of the Federal Power Commission, or of the members, officers, or components thereof.

42 U.S.C. § 7151(b). In addition, Congress transferred to the Secretary of Energy all those functions of the Secretary of the Interior relating to the BPA. 42 U.S.C. § 7152(a)(1)(D–E); (a)(2–3).

■ Plaintiffs rely almost entirely on selected portions of legislative history, and argue that despite the explicit statutory exceptions, Congress intended to give all electric ratemaking powers to the FERC. However, when confronted with a statute which is plain and unambiguous ordinarily one does not look to legislative history as a guide to its meaning. *Ex parte Collett,* 337 U.S. 55, 61, 69 S.Ct. 944, 947, 93 L.Ed. 1207 (1949). "Here it is not *necessary* to look beyond the words of the statute." *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296, 57 L.Ed.2d 117 (1978). *See Maine v. Thiboutot,* —— U.S. ——, —— & n.4, 100 S.Ct. 2502, 2505 & n. 4, 65 L.Ed.2d 555 (1980); *Andrus v. Allard,* 444 U.S. 51, 56, 100 S.Ct. 318, 322, 62 L.Ed.2d 210 (1979). *Andrus v. Sierra Club,* 442 U.S. 347, 356, 99 S.Ct. 2335, 2340, 60 L.Ed.2d 943 (1979); *Southeastern Community College v. Davis,* 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979). *Cf. Sierra Club v. Andrus,* 610 F.2d 581, 588–91 (9th Cir. 1979) (faced with ambiguous legislative history, the court considered the overall statutory scheme). In plain and unambiguous language, Congress granted rate-

making authority for the BPA to the Secretary of Energy, not the FERC. Accordingly, President Carter amended various executive orders to reflect the transfer of functions from the FPC and the Secretary of the Interior to the Secretary of Energy. Executive Order No. 12038, 43 F.R. 4957 (3 Feb. 1978), as amended by Executive Order No. 12156, 44 F.R. 53073 (10 Sept. 1979). In turn, the Secretary of Energy delegated his ratemaking powers for the BPA to the Assistant Secretary for Resource Applications and the FERC. Delegation Order No. 0204–33, 43 F.R. 60636 (21 Dec. 1978). The Assistant Secretary can "confirm, approve, and place in effect such rates on an interim basis," *id.*, ¶ 1, but the interim rates do not become final until confirmed and approved by the FERC, *id.* ¶¶ 1, 2. In addition, the Secretary delegated his authority to the FERC "to exercise the cost allocation authority contained in Section 7 of the Bonneville Project Act [16 U.S.C. § 832f]." *Id.* ¶ 2. The Secretary's delegation order was proper under 42 U.S.C. §§ 7133(a)(1); 7151(b); 7172(e); 7191; 7251; 7252. *See also* 5 U.S.C. § 553.

The government concedes that there is no express authority to promulgate interim rates, but the plaintiffs concede that such authority can, in certain circumstances, be inferred. In *FPC v. Tennessee Gas Transmission Co.*, 371 U.S. 145, 83 S.Ct. 211, 9 L.Ed.2d 199 (1962), a case involving "the authority of the Federal Power Commission after hearing to order an interim rate reduction" under the Natural Gas Act, the Supreme Court stated:

> As all of the respondents admit, there is "no question" as to the Commission's authority to issue interim rate orders. Indeed, such general authority is well established by cases in this Court. . . . [I]n *Natural Gas Pipeline Co. [of America v. F.P.C.]* this Court took pains to point out the fact that "establishment of a rate for a regulated industry often involves two steps of different character, one of which may appropriately precede the other." 315 U.S. [575,] 584 [62 S.Ct. 736, 742, 86 L.Ed. 1037 (1942)].

371 U.S. at 150–51, 83 S.Ct. at 214 (citations omitted). Rate reduction was necessary "to protect consumers against exploitation at the hands of natural gas companies," *id.* at 154, 83 S.Ct. at 216 (quoting *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 610, 64 S.Ct. 281, 291, 88 L.Ed. 333 (1944)). The Court stated:

> under the circumstances here the Commission's ultimate action in directing the severance and in entering the interim order was not only entirely appropriate but in the best tradition of effective administrative practice.

*Id.* at 155, 83 S.Ct. at 216.

Under 42 U.S.C. § 7151(b):

> The Secretary may exercise any power described in section 7172(a)(2) of this title to the extent the Secretary determines such power to be necessary to the exercise of any function within his jurisdiction pursuant to the preceding sentence,

and that preceding sentence includes the functions at issue here. 42 U.S.C. § 7172(a)(2) incorporates the following statutory powers:

> (A) sections 4, 301, 302, 306 through 309, and 312 through 316 of the Federal Power Act; and
>
> (B) sections 8, 9, 13 through 17, 20, and 21 of the Natural Gas Act.

The interim rate reduction order of the FPC in *Tennessee Gas* was upheld under sections 4, 5, and 16 of the Natural Gas Act. Therefore, the interim rate authority of the Secretary under 42 U.S.C. § 7151(b) through § 7172(a)(2)(B) and section 16 of the Natural Gas Act should be beyond question. Nevertheless, plaintiffs argue that the "necessary" language in § 7151(b) coupled with the Supreme Court's references to the "necessities" of the situation in *Tennessee Gas* and *Natural Gas Pipeline* limit the use of interim rates to those situations deemed "necessary." Their argument fails because the power to determine "necessity" lies within the discretion of the Secretary. Here, the Secretary determined that it was "necessary" to divide responsibilities for BPA ratemaking, gave the Assistant Secretary authority to enter interim orders, and

gave the FERC authority to determine final schedules. Delegation Order No. 0204–33, 43 F.R. 60636 (21 Dec. 1978). *See Tennessee Gas* and *Natural Gas Pipeline. Cf. Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978) (court held that ICC, under the Interstate Commerce Act, could suspend initial tariff schedules and establish maximum interim rates). *See also Papago Tribal Utility Authority v. FERC*, 610 F.2d 914, 919 (D.C.Cir. 1980) (FERC's "interim" acceptance of a rate filing was proper).

III. *Procedural Due Process*

Plaintiffs argue that the government defendants have not followed the proper procedures in promulgating and approving the BPA rates. PP&L cites to *U.S. Department of the Interior, Bonneville Power Administration*, Docket No. E–8978, 54 FPC 808 (1975), in which the FPC established policies for considering proposed BPA rates. PP&L quotes the following:

> This Commission . . . believes that it is appropriate and in the public interest to discharge its duties and responsibilities under the Bonneville Project Act and the Flood Control Act of 1944 on the basis of evidentiary records which are developed in the course of public hearings . . . .

54 FPC at 810. PP&L's argument seems to be that because the Assistant Secretary did not hold hearings before approving the rates on an interim basis, that the interim approval must be invalid. ·

■ Assuming, without deciding, that the FPC pronouncement is binding on the Secretary of Energy, there is no basis for holding the Assistant Secretary to such a standard for *interim* approval. As stated before:

> establishment of a rate for a regulated industry often involves two steps of different character, one of which may appropriately precede the other.

*Natural Gas Pipeline*, 315 U.S. at 584, 62 S.Ct. at 742. The FPC twice before granted interim approval for BPA rates prior to *final* consideration. The Supreme Court has upheld such interim action on numerous occasions. *E. g., Trans Alaska Pipeline Rate Cases; Tennessee Gas.*

■ The Secretary delegated final rate-making authority to the FERC, and the FERC is in the process of conducting public hearings. Plaintiffs are now engaged in such hearings. In the circumstances here, I do not find an abuse of the Secretary's discretion to delegate authority and to conduct different procedures with respect to different steps in the decision–making process. The BPA conducted numerous public hearings before submitting its proposed rates to the Assistant Secretary, and the FERC is now conducting its own hearings. To require the Assistant Secretary to hold additional hearings would eviscerate the interim rate scheme, whereby the proposed rates become effective pending the numerous and sometimes prolonged hearings before the FERC.

The Assistant Secretary's interim approval did not provide "a minimum of thirty days following [her order] for an opportunity to comment prior to promulgation of [her order]," as seemingly required by 42 U.S.C. § 7191(b)(1). However, subsection (e) provides that:

> The requirements of subsections (b) . . . of this section may be waived where strict compliance is found by the Secretary to be likely to cause serious harm or injury to the public health, safety, or welfare, and such finding is set out in detail in such . . . order. In the event the requirements of this section are waived, the requirements shall be satisfied within a reasonable period of time subsequent to the promulgation of such . . . order.

I find that the Assistant Secretary's finding under subsection (e) was set out in detail, thereby waiving the 30–day provision of subsection (b)(1). The order, dated 3 December 1979, took effect on 20 December 1979, allowing 17 days for comment. Under the circumstances, a "reasonable period of time subsequent to the promulgation of [the] order" has been satisfied, especially in view of the more formal proceedings before the FERC and the provision for refunds in

the event that the FERC rejects the proposed rates.

■ Plaintiffs also allege that they have not been accorded the process due them, citing *Northern California Power Agency v. Morton*, 396 F.Supp. 1187 (D.D.C.1975) *aff'd* 539 F.2d 243 (D.C.Cir.1976). *NCPA* is not binding precedent and in any event is distinguishable on its facts. There,

> in view of the naturally adversarial relationship of the parties and the absence of a code of procedures to define the ground rules, the process gradually became unmanageable.... The Bureau has since conceded to Congress that it "goofed" in failing to define in advance clear procedures for making in–depth background materials available.
>
> .    .    .    .    .
>
> It appears the final decision was based in part on factual considerations different from those originally advanced in support of the rate increase and subject to comment at the public hearing.

*Id.* at 1189–91 (footnote omitted). Here, the BPA held 23 public meetings at which the plaintiffs were represented. In addition, plaintiffs continue to participate in the FERC hearings on final approval of the BPA rates. These procedures comport with the standard enunciated in *NCPA* :

> In the context of rate–making of this kind, due process requires that the basis advanced for the change be set out in suffcient [sic] detail to permit those affected to make a meaningful response. As a practical matter, this may require on–the–record questioning of experts to lay bare their assumptions and reasoning. Thereafter the decision–maker must set forth the underlying findings and reasoning which led him to his conclusion. An identifiable record must be created for purposes of review. The extent to which detail is required is a practical question which depends on the nature of the subject matter and cannot be resolved in the abstract.

*Id.* at 1193 (footnote omitted). As noted by Judge Gesell in *NCPA*: "[a] formal eviden-

tiary hearing is not required in rule–making proceedings." *Id.* (quoting *Assoc. Elect. Coop. v. Morton*, 507 F.2d 1167, 1177 (D.C. Cir.1974)).

The BPA followed the applicable procedures, first publishing procedures for public involvement, 42 F.R. 62950, and then publishing a notice of "Intent to Develop Revised Wholesale Power Rates," 43 F.R. 2659. After conducting a number of studies, the BPA published its proposed wholesale power rates and noted the availability of a draft environmental impact statement and other materials. 43 F.R. 38356. The BPA held 16 public hearings, after which it revised its proposed rates. 44 F.R. 41744. The BPA held 7 more hearings, and submitted its final proposal. The Assistant Secretary, pursuant to the authority properly delegated by the Secretary, approved the proposed rates on an interim basis. 44 F.R. 70517. The BPA forwarded copies of its official record to FERC, and the FERC acknowledged receipt. 44 F.R. 74879.

As stated before, the procedure followed here is a far cry from the informal procedures found deficient in *NCPA*, and comports with the due process standards set forth by Judge Gesell. Plaintiffs have been afforded all the process due them under the law and Constitution. *See* 5 U.S.C. § 553; 42 U.S.C. § 7191. *Cf. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 543–50, 98 S.Ct. 1197, 1211–1215, 55 L.Ed.2d 460 (1978) ("[a]bsent constitutional constraints or extremely compelling circumstances the 'administrative agencies "should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties" ' "); *FPC v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 333, 96 S.Ct. 579, 583, 46 L.Ed.2d 533 (1976) (an agency should normally be allowed to "exercise its administrative discretion in deciding how, in light of internal organizational considerations, it may best proceed to develop the needed evidence and how its prior decision should be modified in light of such evidence as develops"); *Yassini v. Crosland*, 618 F.2d 1356, 1363 (9th Cir. 1980) ("[w]here

an agency action is not based on individual grounds, but is a matter of general policy, no hearing is constitutionally required, especially where, as in this case, there is a post–decision review"). *But cf. Mt. Airy Refining Co. v. Schlesinger*, 481 F.Supp. 257, 271–75 (D.D.C.1979) (FERC violated the DOE Act's procedural provisions when the final regulations differed significantly from the proposal without intervening notice and hearing).

### IV. *Challenge to the Rate Design*

PP&L denies that it is challenging the particular rate design. However, PGE and the PUC assert that the particular rates applicable to them are contrary to their contracts and to the statutes under which the rates are promulgated. The government acknowledges that judicial review of administrative actions is the rule, and that nonreviewability is an exception that must be clearly demonstrated. Such an exception is available only in "those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971).

The test in this circuit "is not whether a statute viewed in the abstract lacks law to be applied, but rather, whether '*in a given case*' there is no law to be applied." *Strickland v. Morton*, 519 F.2d 467, 470 (9th Cir. 1975) (emphasis in original) (footnote omitted).

> Thus the existence of some law generally applicable to the subject matter in question will not necessarily remove administrative action from the "committed to agency discretion" rubric. There is "law to apply" only if a specific statute limits the agency's discretion to act in the manner which is challenged.

*City of Santa Clara v. Andrus*, 572 F.2d 660, 666 (9th Cir.), *cert. denied*, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978). *See Arizona Power Pooling Ass'n v. Morton*, 527 F.2d 721 (9th Cir. 1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). In *City of Santa Clara* the Ninth Circuit found that the Secretary of the Interior had such broad discretion to market electric power under 16 U.S.C. § 825s that there was no law to apply. *Id.* at 667–68. The court also found that the Secretary's discretion under the preference clause of 43 U.S.C. § 485h(c) was so broad as to preclude judicial review. *Id.* Because the relevant marketing sections challenged here are indistinguishable from those discussed in *City of Santa Clara*, I must decline judicial review because "there is no law to apply."

The Secretary of Energy inherited the marketing power of the Secretary of the Interior under 16 U.S.C. § 825s, and as to that power, the Ninth Circuit has already ruled that there was no law to apply. *City of Santa Clara*. The same is true for former FPC authority under § 825s. The Secretary of Energy also inherited the marketing power of the Secretary of the Interior under 43 U.S.C. § 485h(c), which provides in pertinent part:

> Any sale of electric power or lease of power privileges, made by the Secretary in connection with the operation of any project or division of a project, shall be for such periods, not to exceed forty years, and at such rates as in his judgment will produce power revenues at least sufficient to cover an appropriate share of the annual operation and maintenance cost, interest on an appropriate share of the construction investment at not less than 3 per centum per annum, and such other fixed charges as the Secretary deems proper.

The preference clause that followed was ruled so broad as to preclude judicial review. *City of Santa Clara*. I find that "at such rates as in his judgment will produce power revenues at least sufficient" and "other fixed charges as the Secretary deems proper" is such a broad grant of discretion that there is no law to apply with respect to 43 U.S.C. § 485h(c).

The Secretary of Energy also inherited marketing power from the FPC under 16 U.S.C. §§ 832e and 838g. Section 838g provides in pertinent part:

Such rate schedules may be modified from time to time by the Secretary of the Interior, acting by and through the Administrator, subject to confirmation and approval by the Federal Power Commission, and shall be fixed and established (1) with a view to encouraging the widest possible diversified use of electric power at the lowest possible rates to consumers consistent with sound business principles, (2) having regard to the recovery (upon the basis of the application of such rate schedules to the capacity of the electric facilities of the projects) of the cost of producing and transmitting such electric power, including the amortization of the capital investment allocated to power over a reasonable period of years and payments provided for in Section 838i(b)(9) of this title and (3) at levels to produce such additional revenues as may be required, in the aggregate with all other revenues of the Administrator, to pay when due the principal of, premiums, discounts, and expense in connection with the issuance of and interest on all bonds issued and outstanding pursuant to this chapter, and amounts required to establish and maintain reserve and other funds and accounts established in connection therewith.

The provision in subsection (1)–"with a view to encouraging the widest possible diversified use of electric power at the lowest possible rates to consumers consistent with sound business principles"–tracks the language of 16 U.S.C. § 825s construed in *City of Santa Clara*, and notwithstanding the other subsections, this grant of broad discretion also precludes judicial review because there is no law to apply. Likewise, 16 U.S.C. § 832e provides:

Schedules of rates and charges for electric energy produced at the Bonneville project and sold to purchasers as in this chapter provided shall be prepared by the administrator and become effective upon confirmation and approval thereof by the Federal Power Commission; and such rates and charges shall also be applicable to dispositions of electric energy to Federal agencies. Subject to confirmation and approval by the Federal Power Commission, such rate schedules may be modified from time to time by the administrator, and shall be fixed and established with a view to encouraging the widest possible diversified use of electric energy. The said rate schedules may provide for uniform rates or rates uniform throughout prescribed transmission areas in order to extend the benefits of an integrated transmission system and encourage the equitable distribution of the electric energy developed at the Bonneville project.

The language "with a view to encouraging the widest possible diversified use of electric energy," while not tracking the language contained in 16 U.S.C. §§ 825s, 838g, is similar enough. Notwithstanding the other provisions for rates, I find that 16 U.S.C. § 832e grants such broad discretion to the Secretary that there is no law to apply with respect to that statute.

PGE and the PUC also argue that other provisions relating to rates provide enough law for this court to apply. Specifically, they cite to 16 U.S.C. § 832f and argue that this statute imposes a "cost of service" standard. Section 832f specifies "elements of charges," and states in pertinent part:

Rate schedules shall be drawn having regard to the recovery (upon the basis of the application of such rate schedules to the capacity of the electric facilities of Bonneville project) of the cost of producing and transmitting such electric energy, including the amortization of the capital investment over a reasonable period of years. Rate schedules shall be based upon an allocation of costs made by the Federal Power Commission. In computing the cost of electric energy developed from water power created as an incident to and a byproduct of the construction of the Bonneville project, the Federal Power Commission may allocate to the costs of electric facilities such a share of the cost of facilities having joint value for the production of electric energy and other purposes as the power development may fairly bear as compared with such other purposes.

In addition, they argue that Bonneville violated its own ratemaking standards as set forth in 44 F.R. 68948. They quote the following excerpt:

Now, therefore, Bonneville hereby orders that . . . the following standards are hereby adopted for all Bonneville rates for all classes and types of customers, to–wit:

(1) Cost of service–Rates charged by Bonneville for providing electric service to each class of its customers shall be designed, to the maximum extent practicable, to reflect the costs of providing electric service to such class. [Such costs] shall, to the maximum extent practicable, be determined on the basis of reasonable, accepted accounting methods.

*Id.* at 68949.

Despite all the references to cost, the two quoted passages do not support an inference that cost is the *only* basis upon which rates may be computed. The qualifying phrases "having regard to," "may include," and "to the maximum extent practicable," indicate that the discretion granted in 16 U.S.C. §§ 825s, 832e, 838g; and 43 U.S.C. § 485h(c) were not significantly altered by the requirement to *consider* costs in calculating rates. *See City of Santa Clara.* In fact, as the government points out, at the end of the passage quoted by plaintiffs, BPA states:

The rate design will always consider such an embedded cost–of–service analysis but will also consider other factors, such as marginal or long–run incremental cost principles, the purposes of conservation, efficient use of resources, and equity, and the need to meet legal considerations.

44 F.R. at 68949. This BPA regulation, promulgated pursuant to the Public Utility Regulatory Policies Act (PURPA), 16 U.S.C. §§ 2601 *et seq.*, has not been violated because the BPA *considered* cost–of–service factors in its calculation of rates. That is all that the PURPA requires. *See* 16 U.S.C. §§ 2621(a); 2627(c). *Cf. Wilderness Public Rights Fund v. Kleppe,* 608 F.2d 1250, 1253–54 (9th Cir. 1979) ("[w]here several administrative solutions exist for a problem, courts will uphold any one with a rational basis, but the Secretary's balancing of competing uses must not be an arbitrary one"). *See also Mt. Airy Refining Co. v. Schlesinger,* 481 F.Supp. 257, 264–71 (D.D.C.1979) (FERC adequately considered the relevant factors).

The statutory schemes, taken as a whole, invest the Secretary with such broad discretion, that with respect to the ratemaking challenged here, *judicial* review is not available because there is no *law* to apply. *See also* 16 U.S.C. §§ 832a(b) ("to encourage the widest possible use of all electric energy that can be generated and marketed"); 838(b) ("[o]ther than as specifically provided herein, the present authority and duties of the Secretary of the Interior relating to the Federal Columbia River Power System shall not be affected by this chapter"); 838d ("[t]he Administrator shall make available to all utilities on a fair and nondiscriminatory basis, any capacity in the Federal transmission system which he determines to be in excess of the capacity required to transmit electric power generated or acquired by the United States"); 838h ("the said schedules of rates and charges for the sale of electric power, . . . may provide, among other things, for uniform rates or rates uniform throughout prescribed transmission areas [and t]he recovery of the cost of the Federal transmission system shall be equitably allocated between Federal and non–Federal power utilizing such system").

The Congressional review over the Secretary's actions is more than sufficient to insure compliance. *See* 16 U.S.C. §§ 825j; 825s; 838c; 838i; 42 U.S.C. § 7195. *Compare Sierra Club v. Andrus,* 610 F.2d 581, 600–10 (9th Cir. 1980) (Congress can "authorize" construction projects through specific appropriations, distinguishing *Libby Rod and Gun Club v. Poteat,* 594 F.2d 742 (9th Cir. 1979)) *with Arizona Power Pooling Ass'n v. Morton,* 527 F.2d 721 (9th Cir. 1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976) (Congress had not authorized through appropriations the Secretary of the Interior's "preferences" under 43 U.S.C. § 485h(c)).

684

## CONCLUSIONS

I am limited to a narrow review of agency actions. Congress granted all BPA rate-making authority to the Secretary of Energy, and the Secretary properly delegated that authority to the Assistant Secretary and the FERC. The BPA properly promulgated its proposed rates, the Assistant Secretary properly approved the rates on an interim basis, and the rates are now before the FERC for final approval. The plaintiffs received all the process that was due them. Because there is "no law to apply," I cannot review the substance of the rates. Hence, I must grant judgment to the defendants.